**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **KEY'MARION ENNALS**, | |
| *Plaintiff*, | |
| v. | Case No.: 1:26-cv-00175 BAH |
| **STATE OF MARYLAND**, *et al.*, | |
| *Defendants*. | |

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

COMES NOW the Plaintiff, by and through undersigned counsel, and files this Opposition

to Defendants' Motion to Dismiss, stating as follows:

**TABLE OF CONTENTS**

Introduction.................................................................................................................................1

Background..................................................................................................................................2

Standard of Review.....................................................................................................................12

Analysis.......................................................................................................................................13

    I.    Defendants Are Not Shielded from Liability for Their Egregious Misconduct under Prosecutorial Immunity.................................................................................................13

    II.    Even if This Court Finds that Prosecutorial Immunity Applies Under Current Law, There is a Good Faith Basis for a Change in the Law .........................................25

    III.    The Individual Defendants Are Not Shielded from Liability Under Statutory Immunity...............................................................................................................39

Conclusion ..................................................................................................................................48

Conditional Request for Hearing ...............................................................................................49

Certificate of Service ..................................................................................................................49

**INTRODUCTION**

This case arises from the malicious prosecution of Plaintiff Key'Marion Ennals ("**Mr. Ennals**") for the murder of Ja'len Woolford ("**Mr. Woolford**"). Despite the State obtaining a confession from Deaveon Johnson ("**Mr. Johnson**") for the murder of Mr. Woolford as early as January 4, 2022—a confession corroborated by another witness named Gregory Lamont Cottman on February 15, 2023—Defendants maliciously and unconstitutionally prosecuted Mr. Ennals until a Dorchester County jury found him not guilty after less than 20 minutes of deliberation on September 3, 2024.

As a result, Mr. Ennals was unjustly incarcerated for 631 days, from January 4, 2022 until September 27, 2023, before he was released pretrial, a decision that the court made after determining that State's Attorney Amanda Leonard ("**Defendant Leonard**") and the State's Attorney's Office committed ethical violations by failing to disclose crucial exculpatory evidence that was plainly discoverable under both *Brady* and *Giglio*. While the court disqualified the entire State's Attorney's Office on September 27, 2023, it did not dismiss the case. Instead, it allowed a prosecutor from Prince George's County, Jonathon Church, to enter his appearance and pursue the criminal charges against Mr. Ennals at trial, which began on August 26, 2024. While the trial took four days, the jury only deliberated for approximately eighteen (18) minutes before rendering a verdict of not guilty for all charges against Mr. Ennals.

The Defendants have now jointly filed a motion to dismiss generally seeking dismissal of all claims on two grounds: *one*, that Mr. Ennals' claims are barred by prosecutorial immunity, and *two*, that claims against the individual Defendants are barred by statutory immunity. As outlined below, this Court should decline to apply such expansive immunity that would shield all Defendants from the consequences of their egregious misconduct that resulted in Mr. Ennals losing

his freedom for 631 days. Even after his release, Mr. Ennals was still subjected to the threat of criminal prosecution for another year until he was found not guilty in August 2024.

## BACKGROUND

On January 4, 2022, Mr. Ennals voluntarily walked into the Cambridge City Police Department after learning that there was a warrant for his arrest. ECF 3 at para. 17. The warrant arose from the investigation into the killing of Mr. Woolford on November 18, 2021. ECF 3 at para. 13.

Earlier in the day, before Mr. Ennals was arrested, the Cambridge Police Department executed a search warrant and detained Mr. Johnson. ECF 3 at para. 14. After his detainment, Mr. Johnson was interviewed by Officer Hallman of the Maryland State Police Department. ECF 3 at para. 15. During the interview, Mr. Johnson admitted that he was involved in or responsible for the death of Mr. Woolford. ECF 3 at para. 16. Despite this confession, Officer Hallman allowed Mr. Johnson to name a slew of additional individuals who Mr. Johnson claimed may have been involved with the shooting. *Id*. Mr. Johnson named these individuals under the premise that if he did so, Officer Hallman would speak with the prosector and ensure that Mr. Johnson received a deal. *Id*. As expected of information obtained from a suspect who is providing that information out of his own self-interest to reduce the punishment for the crime he committed, the information provided by Mr. Johnson was plainly unreliable: many of the names provided were never investigated, and some of the named individuals were not even in Maryland on the night of the shooting. *Id*. The remainder of the named individuals, including Mr. Ennals, were falsely charged for a crime that they had not committed. *Id*.

Immediately after Mr. Johnson's confession, and with no other evidence, Officer Hallman filed an Application for Statement of Charges against Mr. Ennals. ECF 3 at para. 17. Mr. Ennals voluntarily walked into the Cambridge City Police Department later that night. *Id.*

When Officer Hallman interviewed Mr. Ennals, Mr. Ennals repeatedly denied involvement in Mr. Woolford's death. ECF 3 at para. 18. Nevertheless, Mr. Ennals was arrested and processed within a few hours of stepping into the station. *Id.* Mr. Ennals had never been charged with any crime prior to his arrest. ECF 3 at para. 19.

Despite a lack of evidence or any previous criminal history, Mr. Ennals was held without bond continuously until the Defendants' misconduct, which is outlined herein, was brought to the court's attention on September 27, 2023. ECF 3 at para. 21. This meant that **Mr. Ennals was held on no-bail status and deprived of his liberty, for a crime that he had not committed, for a total of 631 days—more than 20 months**. *Id.*

The trial proceedings, which were controlled by Defendant Amanda Leonard as the State's Attorney for Dorchester County, Defendant Philip Donoho, as Deputy State's Attorney, and Defendant Ella Disharoon, as an Assistant State's Attorney, were rife with misconduct from the outset. On July 7, 2022, the State requested that the trial court waive Mr. Ennals' speedy trial rights, which the trial court, the Honorable Karen Dean ("**Judge Dean**") presiding, granted over Mr. Ennals' strenuous objection. ECF 3 at paras. 23-24. Judge Dean failed to state the grounds for the waiver on the record or provide any reason for the court's decision. ECF 3 at para. 24. Mr. Ennals' trial was then postponed to February 6, 2023. *Id.* But when Mr. Ennals' counsel filed a request for discovery and inspection, the jury trial was cancelled/vacated. ECF 3 at para. 26.

As Mr. Ennals discovered more than a year later, after the disqualification of Defendants from the case, Defendant Disharoon had engaged in *ex parte* communication with Judge Dean

prior to Judge Dean granting the waiver of Mr. Ennals' speedy trial rights. ECF 3 at para. 85. On July 20, 2022, Defendant Disharoon texted Judge Dean, "We have a motions hearing Friday with you in a homicide (Key'Marion Ennals) and we need to postpone the hearing if possible." *Id*. This *ex parte* communication was not disclosed to Mr. Ennals at any time prior to the court granting the postponement of the trial past the speedy trial/Hick's date and Mr. Ennals was never aware of, nor consented to, such *ex parte* communication. ECF 3 at para. 86, 90.

On February 15, 2023, about a week after the cancellation of Mr. Ennals' rescheduled trial, Officer Hallman and Defendant Donoho interviewed Gregory Lamont Cottman ("**Mr. Cottman**"). During the interview, Mr. Cottman informed Officer Hallman and Defendant Donoho that Mr. Johnson premeditated the murder of Mr. Woolford. ECF 3 at para. 29. He provided information that he learned directly from Mr. Johnson that demonstrated that Mr. Johnson was the one that shot the victim, that Mr. Johnson had been bragging about doing so after the murder, and that Mr. Ennals had not done anything. *Id*. Statements from the interview included, but are not limited to:

a. "Johnson told Cottman that he thought he shot the victim in the side."

b. "Johnson claimed that he was the one who shot the victim."

c. "Cottman said Christian [Tyrone Christian, who was allegedly in a car with Johnson and Ennals before the murder] did not think Ennals did anything because Johnson was bragging about the shooting."

d. "Johnson told Cottman that Los was there when the shooting happened, but he did not want to tell on him."

e. "Cottman thought that his first conversation with Johnson was in June 2022. The first time Johnson told Cottman about the homicide, Johnson said he ran up to the victim and shot him in the head. Cottman stated that he was across the hall from Johnson at a later time, and Johnson told him that he was taking a plea deal soon after Christian had been caught with the gun. When Johnson decided to take a plea, he started to share more details about the homicide with Cottman. When Johnson shared more details, he admitted to Cottman that he did not shoot him in the head but in the side."

*Id*. When Mr. Ennals finally received a copy of the written interview months later, he learned that Mr. Cottman had informed the Defendants that Mr. Johnson claimed Mr. Ennals had not been present during the shooting as he had "bitched out" and left the scene before the murder took place:

> "POPS GAVE SPANKY [Johnson] THE 10 IN THE CAR. THEY TAKE OFF RUNNING UP TO STORM [Decedent]. SPANKY SAYS HE SHOT HIM BUT HE KNOWS HE HIT HIM HE COULDN'T TELL WHERE AT. HE SAID HE WASN'T SURE WHERE KEYBABY [Ennals] WAS. HE SAYS HE RAN BACK TO THE CAR GOT THERE FIRST. THEY WERE LOOKING FOR KEYBABY THEN HE CAME SAID HE HURT HIS KNEE. SPANKY SAID HE THINK HE BITCHED OUT," and "[JOHNSON] TOLD ME [COTTMAN] EVERYTHING HOW IT WAS SETUP AND THAT HE SHOT HIM."

ECF 3 at para. 49. Mr. Cottman provided Officer Hallman and Defendant Donoho with handwritten notes that he kept memorializing his discussions with Mr. Johnson and others at this interview. ECF 3 at para. 32.

Shortly after the interview with Mr. Cottman, the trial court scheduled Mr. Ennals' trial for August 21, 2023. ECF 3 at para. 33. After the new date was scheduled, Mr. Ennals hired Lawrence Greenberg, Esq. ("**Mr. Greenberg**") on March 15, 2023. ECF 3 at para. 34. After entering his appearance, Mr. Greenberg immediately filed a Motion for a Speedy Trial, a Demand for Discovery and Inspection, and a Motion to Suppress. *Id*. These motions asked the State to comply with their discovery obligations by providing all exculpatory evidence or evidence that tends to impeach the State's witnesses. ECF 3 at para. 35. On April 7, 2023, Mr. Greenberg also filed a Demand for Bill of Particulars which requested that the State identify which of the hundreds of thousands of documents were relevant to the case and informed the State that its method of providing discovery had prevented Mr. Ennals from downloading or accessing many of the documents. ECF 3 at paras. 36-37. The trial court granted the demand on April 7, 2023. ECF 3 at para. 36.

5

After the trial court granted Mr. Ennals' demand, Defendant Leonard emailed Mr. Greenberg and said that the State would download all discovery onto a portable hard drive. ECF 3 at para. 38. A few weeks later, Mr. Greenberg's office reached out to Defendant Leonard to request the status of the discovery information requested. ECF 3 at para. 39. On April 26, 2023, Defendant Leonard responded to Mr. Greenberg and represented that the digital discovery drive, which Mr. Ennals could not fully access, contained all the interviews, reports, and other information relevant to the case. ECF 3 at para. 40. **Defendant Leonard further represented that the State was not in possession of any *Brady* or *Giglio* information**. *Id*. This representation was made to Mr. Greenberg *more than two months* after the interview with Mr. Cottman.

Several months later, on September 20, 2023, Defendant Leonard advised Mr. Greenberg that she had conducted a witness preparation meeting with Mr. Johnson where evidence was provided, for the first time, that two individuals, "Los" and Tyrone Christian, were involved in the murder. ECF 3 at para. 41. This interview was apparently not audio or video recorded. *Id*. This interview occurred *more than seven months* after the interview with Mr. Cottman, where Mr. Cottman mentioned both "Los" and Tyrone Christian. ECF 3 at para. 29 ("Johnson told Cottman that Los was there when the shooting happened, but he did not want to tell on him." "Cottman said that Christian … did not think Ennals did anything because Johnson was bragging about the shooting." "…Christian had been caught with the gun."); ECF 3 at para. 53 ("Mr. Greenberg learned that, despite Defendant Leonard's assurances that she learned about new witnesses 'Los' and Tyrone Christian on September 18, 2023, the State actually learned about the two individuals on February 15, 2023 when they interviewed Cottman.").

Immediately following the conversation with Defendant Leonard, Mr. Greenberg sent the following email *once again* requesting that full discovery be provided:

> Lastly, it feels like the saying "you only know what you know," applies here. In the past day, which is approximately a week before trial, you provided us with documentation and information that existed a year ago, as well as new information that could have been provided at a time when we could have engaged in additional discovery to uncover the facts and witnesses to dispute this information. I make a final request that if there is additional information you are sitting on, disclose it now. Please provide this information by the close of business on September 21, 2023, or we will take all legally appropriate actions for these ongoing failures to comply with the law.

ECF 3 at para. 42. The next day, Defendant Leonard called Mr. Greenberg to discuss the email and claimed that she was "one of the honest ones" and that she "does not hide evidence." ECF 3 at para. 43. It was during this call, on September 21, 2023, that Defendant Leonard disclosed to Mr. Greenberg, *for the first time*, that a report authored by Officer Hallman detailing the interview with Mr. Cottman existed but had never been disclosed. ECF 3 at para. 44. This was ***eleven days*** before Mr. Ennals' trial. ECF 3 at para. 45.

Before September 21, 2023, **eleven days before trial** and **more than seven months after the interview with Mr. Cottman**, the State had never disclosed Mr. Cottman's existence nor disclosed any of the information he shared with the State, including, but not limited to, the contents of the interview as well as the handwritten notes memorializing his discussions with Mr. Johnson and others. ECF 3 at para. 45. This evidence not only exculpated Mr. Ennals, but also impeached Mr. Johnson, the State's key witness.

Defendant Leonard admitted that she, and her office, had personal knowledge of the interview when it occurred. ECF 3 at para. 46. Indeed, Defendant Donoho was not only present during the interview, he directly questioned Mr. Cottman and took simultaneous notes, which were also never disclosed to Mr. Ennals. *Id*. When asked about the egregious delay in disclosing the evidence, Defendant Leonard attempted to justify the Defendants' misconduct by suggesting that her failure was not significant because she did not intend to call Mr. Cottman at trial—ignoring

the exculpatory nature of the evidence and the usage of such evidence as impeachment of Mr. Johnson, her office's star witness. ECF 3 at para. 47.

On September 22, 2023, Mr. Greenberg emailed Defendant Leonard and requested that the interview recording and the notes mentioned in the Cottman Supplemental Report be disclosed. ECF 3 at para. 55. Defendant Leonard responded that the information had been uploaded. ECF 3 at para. 56. But Defendant Leonard only uploaded a Supplemental Report from Officer Hallman dated July 31, 2023, which did not include any original reports prepared after the interview with Mr. Cottman and did not include any interview notes from either Officer Hallman or Defendant Donoho. ECF 3 at para. 58, 31. When Mr. Greenberg pointed out these failures to Defendant Leonard, Defendant Leonard responded by claiming that the "supplemental" report actually had the "wrong date in the start of the report" and was the original (and only) report of the interview. ECF 3 at para. 59. Upon receiving the updated report, Mr. Greenberg discovered that someone had changed the date of the Cottman interview to "November 15, 2023," but there were no initials indicating who changed the report—it was simply typed-over. ECF 3 at para. 60. All other documents, including Mr. Cottman's handwritten notes and the *Miranda* form were dated and signed on February 15, 2023. ECF 3 at para. 61.

It is unclear how Defendant Leonard thought she could convince anyone that the interview occurred on a future date (November 23, 2023), especially when the defense was already in possession of the prior report. ECF 3 at para. 62. Further, her September 23, 2023 email to Mr. Greenberg explaining that the "original sent to me had the wrong date in the start of the report," shows, at best, sloppy police work and that multiple reports were generated, or at worst, the police and the State's Attorney's Office were attempting to suborn perjury and fraud. *Id*. Either way, reports were altered and not disclosed in an effort to prejudice Mr. Ennals. *Id*.

8

Defendants voluntarily withheld evidence that plainly should have been disclosed under *Brady* and *Giglio*. Defendants knew on February 15, 2023 that this evidence existed and was discoverable. But despite this knowledge, Defendant Leonard represented on April 26, 2023 that the State was not in possession of any *Brady* or *Giglio* material. ECF 3 at para. 40. Even after disclosing the existence of Mr. Cottman on September 21, 2023, ECF 3 at para. 44, Defendants continued to attempt to hide the egregiousness of their misconduct by repeatedly failing to file the required service of discovery, presumably to avoid alerting the trial court of Defendants' *Brady* violations and their late, incomplete disclosures of new exculpatory evidence. ECF 3 at para. 57.

**As of seven days before trial**, Defendant Leonard and her office had committed multiple ethical and legal violations, failed to provide additional notes mentioned in the report, failed to file service of discovery notice with the court, and failed to provide a finalized list of trial witnesses and trial evidence disclosures that are mandatory and must be done without request under Md. Rule 4-263. ECF 3 at para. 65. **As of seven days before trial**, Defendants had yet to provide the State's documents, including but not limited to Officer Hallman or Defendant Donoho's original report or notes prepared after Mr. Cottman's February 15, 2023, interview, notes depicting any interview or investigation with any person after Mr. Cottman's interview, or any other documents that the State had not previously disclosed. ECF 3 at para. 66.

Further, at the time of Mr. Cottman's interview, Mr. Cottman was an inmate in Somerset County awaiting trial. ECF 3 at para. 67. But he was released from commitment on March 17, 2023, approximately one month after the interview. *Id*. It is unknown if the State entered a plea bargain with Mr. Cottman, even though Defendants were required to divulge any plea agreements if they were made. *Id*.

At some point after Mr. Greenberg's discovery of the illegally withheld exculpatory evidence, Defendant Disharoon engaged in *ex parte* communication with Judge Dean, stating that "she was not part of what was about to become public." ECF 3 at para. 79. Despite requests to disclose the exact nature of the *ex parte* communications, neither the State nor the trial court disclosed the extent or content of the *ex parte* communications. ECF 3 at para. 80. However, Defendant Disharoon's counsel later disclosed that Defendant Disharoon had texted Judge Dean on September 25, 2023, stating that "I have nothing to do with anything that might be filed over the next few days. Only been in this case for a couple weeks. Just fyi…" ECF 3 at para. 88. But, as noted above, Defendant Disharoon had been texting Judge Dean regarding Mr. Ennals' case since July 20, 2022, a year prior, meaning this statement was blatantly false. ECF 3 at para. 89.

Following this egregious misconduct, the trial court granted Mr. Ennals' Motion to Disqualify State's Attorney Amanda Leonard, ASA Ella Disharoon, and the State's Attorney's Office for Dorchester County. ECF 3 at para. 72. The motion was granted because of the Defendants withholding exculpatory evidence for over seven months and only disclosing the evidence on the eve of trial. ECF 3 at para. 73. At the time of this hearing, Mr. Ennals had been incarcerated for a crime that he had not committed for 631 days. ECF 3 at para. 75.

After the disqualification, Assistant State's Attorney Jonathon Church from Prince George's County was assigned as Special Prosecutor. ECF 3 at para. 78.

Mr. Ennals' criminal trial began the following year on August 26, 2024, and lasted four days. ECF 3 at para. 92. A jury returned a not guilty verdict on all counts within 18 minutes. ECF 3 at para. 93.

After confessing his guilt, Mr. Johnson was charged with murder in the first degree along with several other felony charges. ECF 3 at para. 20. On October 24, 2022, while Mr. Ennals was

10

sitting in prison for a crime that *Mr. Johnson* admitted he committed, the State offered Mr. Johnson a formal plea agreement in which Mr. Johnson would plead guilty to the murder charge and testify for the State against Mr. Ennals. ECF 3 at para. 25. In return, the State agreed to enter a nolle prosequi as to all other counts of the indictment and recommend that Mr. Johnson receive a sentence of life, with all suspended by forty years. *Id*. Mr. Johnson was ultimately sentenced to life, with all suspended but twenty-five years, for murdering Mr. Woolford. *Id*.

Mr. Ennals suffered significant damage from his lengthy and unjustified incarceration. ECF 3 at para. 94. In addition to physical and emotional damage, Mr. Ennals' sister died while he was incarcerated. *Id*. Mr. Ennals filed a motion for compassionate release to attend her funeral, but Defendant Leonard opposed the motion and Judge Dean denied the compassionate release. *Id*. In the end, Mr. Ennals was not permitted to attend his sister's funeral. *Id*.

On December 4, 2025, Plaintiff filed suit against Defendants State of Maryland, Leonard, Donoho, and Disharoon in the Circuit Court for Dorchester County, Maryland, pleading:

**Count I**: Violation of Articles 24 and 26 of the Maryland Declaration of Rights
Malicious Prosecution
Against All Defendants

**Count II**: Violation of the Fourth Amendment of the United States
Malicious Prosecution
Against All Defendants

**Count III**: Common Law Malicious Prosecution
Against All Defendants

**Count IV**: Negligent Training, Hiring, Supervision, and Retention
Against Defendant State of Maryland

**Count V**: Gross Negligence
Against Defendants Leonard, Donoho, and Disharoon

**Count VI**: Negligence
Against All Defendants

11

**Count VII**:    Indemnification
　　　　　　　　Against Defendant State of Maryland

*See generally* ECF 3. On January 16, 2026, Defendant State of Maryland removed this action to this Court. ECF 1. Defendants Leonard, Donoho, and Disharoon "consented to the removal" but did not join. ECF 1 at 3.

On January 22, 2026, Defendants filed a joint motion to dismiss seeking the dismissal of all claims pled against them. ECF 5. In their motion, Defendants raise no contest to the substantive merits of Plaintiff's claims, instead solely contending that this Court should dismiss Plaintiff's claims due to various immunities. ECF 5-1. Indeed, it is evident that Plaintiff's claims *are* meritorious and adequately plead claims to relief that are plausible on their face. The sole issue before this Court on Defendants' joint motion is whether Defendants are immune to the significant harm caused by their misconduct, under prosecutorial immunity or sovereign immunity, or whether Defendants can be held accountable for their conduct.

## STANDARD OF REVIEW

In ruling on a Rule 12(b)(6) motion, this Court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

A complaint needs only to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While a plaintiff needs to show "more than a sheer possibility that a defendant has acted unlawfully," a plaintiff is not required to meet a "probability requirement" to survive. *Id*.

12

Where a government official seeks dismissal based on absolute immunity, it is their burden to prove that immunity applies. "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 478 (1991)). When considering whether absolute immunity applies, this Court should use the "functional approach" and look to "the nature of the function performed, not the identity of the actor who performed it." *Id.* at 269.

**ANALYSIS**

**I.      Defendants Are Not Shielded from Liability for Their Egregious Misconduct under Prosecutorial Immunity.**

The defense is correct that prosecutors are entitled to prosecutorial immunity for their role as an advocate in the judicial system. But the defense is incorrect in their assertion that prosecutors are "absolutely immune" from any possible claim arising out of any possible action performed in "their role in the judicial process." ECF 5-1 at 6. This immunity does not encompass every single action taken in the performance of their job duties, and the immunity does not apply to the circumstances arising here.

The purpose of prosecutorial immunity, in theory, is to protect the prosecutor from "harassment by unfounded litigation" such that the prosecutor does not "shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976). Thus, the doctrine arose from the recognition that a prosecutor's *judgment* and *decision making* should not be subject to civil suit lest potential liability for the consequences of those decisions impede the prosecutor's judgment. *See, e.g., id.* at 424–26 ("A prosecutor is duty bound to exercise his best ***judgment*** both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every ***decision*** by the consequences in terms of his own potential liability

13

in a suit for damages. […] Defending these **decisions**, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials.") (emphasis added).

The defense outlines an overbroad immunity that steps far beyond conduct arising from a prosecutor's judgment and decision making during the adversarial process to instead encompass any action taken during the pendency of litigation. ECF 5-1 at 7 (implying that because the misconduct arose "after Mr. Ennals was arrested, charged, and denied bail," it must necessarily follow that such actions were related to "preparing to present the case at trial."). But a careful review of cases applying this immunity demonstrates that it is not so broad.

To define the scope of the immunity, the defense points to *Imbler*, *Gill v. Ripley*, 352 Md. 754 (1999), *State v. Rovin I*, 472 Md. 317 (2021), *Nero v. Mosby*, 890 F.3d 106 (4th Cir. 2018), *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), and *Carter v. Burch*, 34 F.3d 257 (4th Cir. 1994).[1] As outlined below, these cases demonstrate that immunity applies to *advocative decision making*, which did not occur here.

In *Imbler*, a man was convicted of felony murder. His defense to the crime was an alibi: that he had "spent the night of the Hasson killing bar-hopping with several persons…" 424 U.S. at

---

[1] The defense also cites to *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), aff'd, 275 U.S. 503 (1927), and *Wood v. Strickland*, 420 U.S. 308, 319 (1975), abrogated by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), in a string cite.

*Yaselli* far predates *Imbler*, the pivotal case on prosecutorial immunity. Indeed, *Yaselli* is far less developed than later case law, solely stating the following regarding the breadth of immunity: "In our opinion the law requires us to hold that a special assistant to the Attorney General of the United States, in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution based on an indictment and prosecution, although it results in a verdict of not guilty rendered by a jury." 12 F.2d at 406.

*Wood* involved a case against school administrators and has since been abrogated.

412. He was found guilty and his sentence was affirmed after appeal. *Id*. After the conclusion of the appellate proceedings, the Deputy District Attorney, who had been the prosecutor at trial, "wrote to the Governor of California describing evidence turned up after trial" that included "newly discovered corroborating witnesses for Imbler's alibi, as well as new revelations about prime [prosecution] witness Costello's background which indicated that he was less trustworthy than he had represented originally to [the prosecutor] and in his testimony." *Id*. During a subsequent habeas corpus hearing, the key prosecution witness Costello, who had identified Imbler as the suspect at trial, "recanted his trial identification of Imbler," and "Imbler's corroborating witnesses … also testified" in support of Imbler's alibi defense. *Id*. at 413.

The writ was ultimately denied. *Id*. But pursuant to a habeas corpus petition submitted years later, the federal district court "found eight instances of state misconduct at Imbler's trial, the cumulative effect of which required issuance of the writ." *Id*. at 414. The prosecutorial misconduct included the use "of misleading or false testimony" as well as two instances of "suppressions of evidence favorable to Imbler…" *Id*. at 414-15. California chose not to retry Imbler. *Id*. at 415. Imbler then filed suit against the prosecutor alleging that the prosecutor had:

> "with intent, and on other occasions with negligence" allowed Costello to give false testimony as found by the District Court, and that the fingerprint expert's suppression of evidence was "chargeable under federal law" to Pachtman. In addition Imbler claimed that Pachtman had prosecuted him with knowledge of a lie detector test that had "cleared" Imbler, and that Pachtman had used at trial a police artist's sketch of Hasson's killer made shortly after the crime and allegedly altered to resemble Imbler more closely after the investigation had focused upon him.

*Id*. at 416. The Supreme Court determined that these activities "were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." *Id*. at 430. Succinctly put, the Imbler holding extended solely to

determining that the immunity applied to "initiating a prosecution and in presenting the State's case," and no further. *Id*. at 431. Indeed, the Court noted that preparation for trial includes:

> the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

*Id*. Thus it is plainly evident that some actions undertaken taken by prosecutors—even after the filing of the indictment, during the trial preparation period—falls outside the scope of the immunity. These "administrative" functions may apply to the maintenance and handling of evidence, including, but not limited to, the "obtaining, reviewing, and evaluating of evidence."

The Supreme Court further defined the boundaries of immunity a few decades later in *Buckley*. There, the plaintiff was incarcerated "for three years on charges growing out of the highly publicized murder of Jeanine Nicarico, an 11–year–old child, on February 25, 1983." 509 U.S. at 261. The plaintiff then sued multiple defendants, including the prosecutors assigned to his case, alleging that they had fabricated evidence related to unreliable expert testimony falsely linking a pair of the plaintiff's boots to a boot print left at the scene of the murder. *Id*. at 262. In beginning their analysis, the *Buckley* court rejected the defense position taken here that was relied upon by the Court of Appeals below: that the prosecutors were "entitled to absolute immunity because the injuries suffered by petitioner occurred during criminal proceedings." *Id*. at 271. Indeed, the *Buckley* court once again affirmed that the immunity is dependent upon "the conduct for which immunity is claimed," not on the harm caused, the lawfulness of the conduct, or where the conduct took place. *Id*. The conduct at issue does not fall within the scope of the immunity "merely because they are performed by a prosecutor." *Id*. at 273. After all, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id*.

16

In *Buckley*, the Court ultimately concluded that immunity did not apply to the fabrication of evidence pre-indictment, as, at the time, the function of the prosecutors and detectives were the same and therefore each were entitled to the same qualified immunity. *Id*. at 276. *Buckley* also determined that defamatory statements made by one of the prosecutors to the media were similarly not covered by absolute immunity, as "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." *Id*. at 277. It did not matter that press conferences "may be an integral part of a prosecutor's job," or that press conferences "may serve a vital public function"—after all, "other executive officials who deal with the press" have similar duties without absolute immunity. *Id*. at 278. These functions, which are not unique to the prosecutor, do "not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions" rendering immunity inapplicable. *Id*.

In *Carter*, the plaintiff was convicted for "the malicious wounding of his ex-wife." *Id*. at 259. The plaintiff presented an alibi defense at trial, claiming he was in another state at the time of the assault. *Id*. A jury convicted the plaintiff on both charges. *Id*. After his conviction, "a deputy sheriff of Loudoun County contacted Carter's defense counsel and informed him of exculpatory evidence that he had told to [the prosecutor] before Carter's trial and which had not been revealed to defense counsel." *Id*. at 259-60. The evidence included the ex-wife telling the deputy sheriff that she hated her ex-husband so much that she "would shoot myself even if I died if I could make it look like he did it so he would spend the rest of his life in jail, ruin the rest of his life" and showing him the gun that later was allegedly used to wound her. *Id*. at 260. "Based on the nondisclosure of this evidence," the trial judge "released Carter on a writ of habeas corpus…" *Id*. Relying on *Imbler*, *Burns*, *infra*, and *Buckley*, the Fourth Circuit concluded that "[i]f Burch knew of the 'Poppa evidence' before Carter's trial, the decision as to whether the evidence was

17

exculpatory and should have been given to defense counsel involved Burch's actions as an advocate of the State." *Id*. at 262. In other words, the "*decision*" on whether evidence was discoverable and/or exculpatory fell within "the type of prosecutorial function for which absolute immunity should be granted." *Id*.

Taken together, *Imbler*, *Buckley*, *Carter*, and two additional cases not cited by the defense drew the primary boundaries of prosecutorial immunity before the turn of the century. *Burns v. Reed*, 500 U.S. 478, 478, 491 (1991) (immunity applies for participating in a probable cause hearing because presenting evidence in support of a motion for a search warrant is an action taken in the prosecutor's "role as advocate for the State" but does not apply to giving legal advice to police); *Kalina v. Fletcher*, 522 U.S. 118, 129-131 (1997) (concluding that "activities in connection with the preparation and filing of two of the three charging documents—the information and the motion for an arrest warrant—are not protected by absolute immunity," but did extend to the prosector's signing under penalty of perjury the "Certificate for Determination of Probable Cause," as "[t]estifying about facts is the function of the witness, not of the lawyer."). It was evident from these cases that absolute immunity must be applied using the functional approach, focusing on the conduct at issue rather than the office of the individual engaging in the conduct. Prosecutorial immunity applies where a prosecutor is exercising their judgment while initiating a criminal case and/or while preparing for or presenting the State's case—in other words, engaging in conduct unique to the prosecutor's role as an advocate for the State and arising out of the prosecutor's exercise of judgment. Prosecutorial immunity *does not* apply where the prosecutor engages in conduct that is not unique to the prosector's position, such as investigatory functions like police or detectives, media functions like any executive official, administrative functions common to any administrator, or witnessing functions such as providing factual testimony.

18

It is upon this background that the final four cases cited by the defense arise: *Gill* and *Rovin I* in Maryland, and *Nero* and *Van de Kamp* in federal court. In *Van de Kamp*, the plaintiff alleged that prosecutors failed to disclose to his attorney "facts about [a key witness's] earlier testimony-related rewards," and that the failure resulted from the failure of supervisory attorneys to adequately train and supervise the prosecutors responsible for the plaintiff's case. 555 U.S. at 340. As with the prior cases, *Van de Kamp* re-emphasized the functional approach analysis and reaffirmed that the immunity "may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Id*. at 342. While the Court noted that supervision and training is a distinctly administrative function, the specific focus of the plaintiff's claims "necessarily require legal knowledge and the exercise of related discretion," such claims fell within the immunity. *Id*. Indeed, the "management tasks at issue, insofar as they are relevant, concern how and when to make impeachment information available at a trial. They are thereby directly connected with the prosecutor's basic trial advocacy duties." *Id*. at 344. Once again, as with the prior cases applying immunity, the key determinative factor was that the conduct at issue was uniquely within the province of a prosecutor and required legal knowledge and the exercise of discretion.

*Nero* arose from the criminal indictments filed against six police officers in the wake of the death of Freddie Gray, Jr. While a grand jury indicted all six involved officers, one officer was tried before a jury and obtained a mistrial after the jury could not reach a unanimous verdict, two officers were found not guilty after bench trials, and Marilyn Mosby dismissed all charges against the final three officers. 890 F.3d at 116. The officers sued State's Attorney Marilyn Mosby while the charges were pending, alleging that the charges had been brought "without probable cause" and that Marilyn Mosby had "defamed the Officers by making false accusations against them"

during a press conference. *Id*. The Fourth Circuit recognized the mandate in the Supreme Court

that "absolute immunity safeguards the process, not the person," and therefore "extends only to

actions 'intimately associated with the judicial phase of the criminal process.'" *Id*. at 117-118

(quoting *Imbler*, 424 U.S. at 430-31). The Fourth Circuit summarized the immunity as follows:

> In applying this functional approach, the Supreme Court has distinguished between
> advocative functions and investigative or administrative functions, holding that the
> former enjoy absolute immunity but the latter do not. *See Kalina*, 522 U.S. at 125-
> 26, 118 S.Ct. 502. A prosecutor acts as an advocate when she professionally
> evaluates evidence assembled by the police, *Buckley*, 509 U.S. at 273, 113 S.Ct.
> 2606, decides to seek an arrest warrant, *Kalina*, 522 U.S. at 130, 118 S.Ct. 502,
> prepares and files charging documents, *id*., participates in a probable cause hearing,
> *Burns*, 500 U.S. at 492, 111 S.Ct. 1934, and presents evidence at trial, *Imbler*, 424
> U.S. at 431, 96 S.Ct. 984. In contrast, a prosecutor does not act as an advocate, but
> rather in an investigative or administrative capacity, when she gives legal advice to
> police during an investigation, *Burns*, 500 U.S. at 493, 111 S.Ct. 1934, investigates
> a case before a probable cause determination, *Buckley*, 509 U.S. at 274, 113 S.Ct.
> 2606, and personally attests to the truth of averments in a statement of probable
> cause, *Kalina*, 522 U.S. at 129, 118 S.Ct. 502.

*Id*. at 118. Directing that false charges be filed or erroneously advising that probable cause supports

charges arises from the prosecutor's "decision to prosecute them," and therefore falls within the

scope of immunity. *Id*. at 119.

While the Fourth Circuit has determined that Maryland prosecutorial immunity is the same

in breadth and application as the federal analogue discussed above, Maryland cases provide

additional helpful analytical markers. *Nero*, 890 F.3d at 122 ("we see no reason to construe the

nature of absolute prosecutorial immunity under Maryland common law differently than the same

immunity under federal common law."). In any event, the defense cites two Maryland cases in

support of their position: *Gill* and *Rovin I*.

*Gill* arose from a paternity action. 352 Md. at 756. The prosecutor defendants in the case

had filed a paternity suit on behalf of the plaintiff-mother, and the action lasted for two years even

after blood tests "indicated a 99.97% probability" that the father was indeed the child's biological

parent. *Id*. Eventually, the mother contended that the prosecutors grew disillusioned with the troublesome case and dismissed the paternity action with prejudice. *Id*. at 757. The dismissal was done via a consent order that the prosecutors filed on the docket without the mother's signature and over her objection. *Id*. at 758. A later action was permitted to proceed despite res judicata as the Supreme Court of Maryland concluded that the prosecutor's action had been "contrary to the best interests of the child." *Id*. After engaging in a lengthy analysis of the origins of the doctrine in both federal and state courts across the country, the *Gill* Court noted that Maryland has "adopted the functional approach taken by the Supreme Court [with respect to judicial immunity], holding that absolute immunity protects judges 'so long as their acts are 'judicial' ... in nature and within the very general scope of their jurisdiction.' […] There is no reason to depart from that approach with respect to prosecutorial immunity." *Id*. at 770 (quoting *Parker v. State*, 337 Md. 271, 284 (1995)). Thus, the *Gill* Court drew the boundaries of immunity as follows:

> We conclude, therefore, as a matter of Maryland common law, that prosecutors enjoy absolute immunity with respect to claims arising from their role in the judicial process—evaluating whether to commence a prosecution by criminal information, presenting evidence to a grand jury in the quest for an indictment, filing charges, and preparing and presenting the State's case in court.

*Id*. In keeping with this definition, the Court concluded that "the decision to terminate a prosecution" was "within the ambit of absolute prosecutorial immunity." *Id*. at 774.

The final case relied upon by the defense is *Rovin I*, which arose from a case involving juror intimidation and second-degree assault allegations. 472 Md. at 328. During the jury trial, the trial court granted a motion of acquittal. *Id*. at 329. The plaintiff subsequently filed suit, contending that "her actions did not constitute a crime as a matter of law and that therefore no probable cause existed for the prosecution." *Id*. at 334. With little analysis, the *Rovin I* Court concluded that "there was no genuine dispute of material fact as to the prosecutors' entitlement to absolute common law

immunity in the form of prosecutorial immunity." *Id*. at 349. In any event, this case arises from the prosecutorial decision to initiate proceedings, with the same outcome as *Nero* and *Kalina*.

In sum, functions that fall *within* the breadth of the immunity are those that require prosecutorial judgment and decision making, which occur after probable cause has been established. For example, deciding whether evidence is discoverable (*Carter*), participating in a probable cause hearing (*Burns*), preparing and presenting a motion for arrest warrant (*Kalina*), initiating prosecution without probable cause (*Nero*, *Rovin I*), presents evidence at trial (*Imbler*), terminates a case (*Gill*), participates in trial preparation meetings (*Savage*).[2]

Functions that fall *outside* the breadth of immunity are those that are investigatory, administrative, or fall outside the unique functions of the prosecutor and do not require specialized legal knowledge, judgment, or decision making. For example, statements made to the media (*Buckley*), pre-indictment fabrication of evidence (*Buckley*), giving legal advice to police (*Burns*), providing testimony (*Kalina*). "Administrative" tasks are functions that are not "directly connected with the prosector's basic trial advocacy duties" and do not "require legal knowledge and the exercise of related discretion." *Safar v. Tingle*, 859 F.3d 241, 249 (4th Cir. 2017) (quoting *Van de Kamp*, 555 U.S. at 344, 346)).

Turning to this case, it is evident that the misconduct alleged in Mr. Ennals' complaint is administrative in nature, not advocative, and therefore falls outside the scope of prosecutorial immunity. Mr. Ennals' claims generally arise from two categories of misconduct: Defendant Disharoon engaging in *ex parte* communication with the trial judge on multiple occasions, ECF 3 at paras. 79-90, and the Defendants' failure to disclose the evidence arising out of the interview

---

[2] *Savage v. Maryland*, 896 F.3d 260, 269 (4th Cir. 2018) (absolute prosecutorial immunity applied to hostile work environment claim arising out of prosecutor reading racist slurs from potential trial evidence during a trial preparation meeting).

with Mr. Cottman on February 15, 2023. ECF 3 at paras. 29, 32, 41, 44, 49, 53. The Defendants had "direct knowledge" of the existence of this evidence since the date of the interview. ECF 3 at para. 63. The Defendants knew that this material was required to be disclosed under *Brady* and *Giglio*, to the point that the Defendants repeatedly failed to file required services of discovery to avoid alerting the court of the Defendants' discovery violations. ECF 3 at para. 57. The Defendants also attempted to alter the reports to change the dates to cover up the discovery violations. ECF 3 at para. 62. The trial court ultimately disqualified Defendants from the case due to their discovery violations and their failure to disclose exculpatory evidence for over seven months. ECF 3 at para. 73. That the Defendants knew they were obligated to disclose the evidence is also apparent in Defendant Disharoon's *ex parte* communication to the trial judge, where she attempted to distance herself from the misconduct by alleging that she had "nothing to do with anything that might be filed over the next few days." ECF 3 at para. 88. Indeed, although the Defendants knew and recognized their discovery obligations, they instead "ignored" the evidence and failed to transmit it to Mr. Ennals' counsel. ECF 3 at para. 99.

This case is not like *Carter*, where the prosecutor made a *decision* "as to whether the evidence was exculpatory and should have been given to defense counsel…" 34 F.3d at 262. Here, Defendants either *actually knew* that the evidence was discoverable, and simply failed to transmit the evidence to Mr. Ennals' counsel, or *constructively knew* that the evidence was discoverable, as it would be evident to any reasonable attorney that the Defendants were obligated to disclose the evidence under *Brady* and *Giglio*. Either way, the misconduct here was not the Defendants *deciding* that the material was not discoverable. The misconduct is that the Defendants decided that the material *is* discoverable but failed to *timely transmit* the material. The transmission of the discovery material is a plainly administrative act—attaching the documents to a discovery drive

23

and sending to counsel is the work of any administrative assistant and does not require "legal knowledge and the exercise of related discretion." *Safar*, 859 F.3d at 249.

In that vein, it is evident that this case does not fall along the same lines as *Carter*, *Burns*, *Kalina*, *Imbler*, *Nero*, *Robin I*, *Gill*, or *Savage*. The failure to transmit the files was not one that required judgment or decision making, unlike initiating or terminating prosecution, conducting trial preparation meetings, presenting evidence at trial, or participating in court proceedings. The failure here was administrative: failing to mail documents, or transmit by electronic mail, or otherwise upload the documents into a downloadable discovery database. This is a function that any administrator could—and often does—perform, without the benefit of absolute immunity. Just as prosecutors were not shielded by absolute immunity in *Buckley* for making statements to the media, a function that is shared among many types of government officials without such immunity, so too should the Defendants here not be shielded by absolute immunity for failing to undertake a secretarial task.

The defense misinterprets Plaintiff's complaint as attempting to supersede the immunity by the egregiousness of the Defendants' misconduct—in other words, attempting to claim that the immunity would not apply because the misconduct was deliberate, malicious, and unethical. While a jury could absolutely conclude that Defendants' conduct was just that—deliberate, malicious, and unethical—the egregiousness of the conduct is not the key determinative factor when determining whether immunity applies. As explained above, the analysis is functional, looking to the *nature* of the conduct, and the misconduct alleged in the complaint is administrative.

As for Plaintiff's claims based in negligent training and supervision, the defense contends that such claims are also barred by prosecutorial immunity. To support this proposition, the defense relies solely on *Van de Kamp*. But in Van de Kamp, the Supreme Court concluded that the training

and supervision count fell within the bounds of prosecutorial immunity because the conduct alleged "necessarily require legal knowledge and the exercise of related discretion." 555 U.S. at 342. The specific training deficiencies were, therefore, "directly connected with the prosecutor's basic trial advocacy duties." *Id*. at 344. But as discussed above, the misconduct here was administrative, not advocative. Therefore, it follows that the Defendants' failure to properly train and supervise to prevent such misconduct was similarly administrative.

Accordingly, this Court should deny the Defendants' motion.

**II.      Even if This Court Finds that Prosecutorial Immunity Applies Under Current Law, There is a Good Faith Basis for a Change in the Law.**

Absolute immunity is not necessary to protect anyone from frivolous claims as court rules and case law already perform this function. *See generally* Federal Rule 12; MD. RULE 1-341(a) (describing the court's authority to dismiss frivolous claims). Instead, cloaking prosecutors with absolute immunity from civil liability permits prosecutors to knowingly partake in tortious conduct with impunity.

The greater the power of the individual wielding the immunity, the more likely the immunity is subject to devastating abuse. Peter L. Davis, *Rodney King and the Decriminalization of Police Brutality in America*, 53 MD. L. REV. 271, 292–93 (1994) ("Prosecutors enjoy unparalleled power in our society. Traditionally, this power has manifested itself most clearly in the prosecutor's decision whether to bring charges . . . . Concurrent with this power . . . there exists the great potential for abuse."). There are few officials holding more sway over the lives of Marylanders than Maryland State's Attorneys. These prosecutors decide which crimes are prosecuted, who is prosecuted, and what sentences are sought. *See* MD. CODE ANN., CRIM. PROC. §§ 14-106–14-111 (West 2008) (describing the duties of Maryland state prosecutors, including investigating and filing cases).

Maryland prosecutors have used their power to make Maryland the nation's leader in incarcerating the highest percentage of Black people in the country, at seventy-one percent, which is more than *twice* the national average. ASHLEY NELLIS & CELESTE BARRY, A MATTER OF LIFE, THE SENTENCING PROJECT (2025), https://www.sentencingproject.org/app/uploads/2025/01/A-Matter-of-Life-The-Scope-and-Impact-of-Life-and-Long-Term-Imprisonment-in-the-United-States.pdf; *see also* Yanet Amanuel, *Let's Believe in the Power of People to Change*, ACLU MD. (March 28, 2024), https://www.aclu-md.org/en/news/lets-believe-power-people-change. The choices made by Maryland prosecutors have also resulted in Maryland leading the nation in sentencing "young Black men to the longest prison terms, at a rate twenty-five percent higher than the next nearest state—Mississippi." *Id*.

On average, Maryland prosecutors prosecute and seek incarceration for four and half innocent people every three years. *See Exonerations—States, Maryland*, THE NATI'L REGISTRY OF EXONERATIONS (showing that Maryland has exonerated 54 individuals since 1989, about 2 individuals per year). The National Registry of Exonerations currently lists fifty-four convicted Marylanders who were later exonerated in the period from 1989 until 2025—an average of one and half false convictions every year for thirty-six years. *See Exonerations—States, Maryland*, THE NATI'L REGISTRY OF EXONERATIONS, https://www.law.umich.edu/special/exoneration/Pages/browse.aspx?View=%7BB8342AE7-6520-4A32-8A06-4B326208BAF8%7D&FilterField1=State&FilterValue1=Maryland (last visited May 5, 2025). Of those exonerated during this period, forty-one cases involved official misconduct, and fifteen of them included false or misleading forensic evidence by prosecutors. *Id*. These factors are not mutually exclusive either. One man's case was mired by both official misconduct and false or misleading forensic evidence, resulting in him spending thirty-two years in prison. *Id*.

26

Despite its sweeping impact, prosecutorial immunity was created *not* by elected representatives through a legislative process involving the people, but by fiat of the courts. *See Prosecutorial Immunity*, INST. FOR JUST., https://ij.org/issues/project-on-immunity-and-accountability/immunity-forprosecutorial-conduct/ (last visited Jan. 10, 2025). While the first judicial recognition of prosecutorial immunity in Maryland is uncertain, the first mention of the practice appeared in 1981 in *Ambrose v. Gersh*, wherein the Court declined to decide whether the appellee's following contention sufficiently demonstrated that the immunity of Maryland prosecutors had been previously recognized:

> Appellee argues that "although the issue of prosecutorial immunity has not come directly before the Maryland Courts of Appeals, it appears in dicta that the absolute immunity of prosecutors is recognized," *citing Carr v. Watkins*, 227 Md. 578, 583, 177 A.2d 841 (1962) and *Eliason v. Funk*, 233 Md. 351, 356, 196 A.2d 887 (1964), which in turn cite *Yareli v. Goff*, 12 F.2d 396 (2nd Cir. 1926), *aff'd per curiam*, 275 U.S. 503, 48 S. Ct. 155, 72 L. Ed. 395, wherein a Special Assistant to the Attorney General of the United States was held absolutely immune from civil liability for statements made while performing his duties.

*Ambrose v. Gersh*, 46 Md. App. 71, 75 n.1 (1980), *aff'd*, 291 Md. 188 (1981). Regardless of whether the "dicta" from 1962 was sufficient, by 1997, Maryland courts undoubtedly adopted common law prosecutorial immunity in *Simms v. Constantine*, 113 Md. App. 291, 304 (1997) ("What emerges from . . . the extensive case law emanating from the Supreme Court of the United States on the subject of the immunity . . . albeit not . . . binding authority in Maryland, is nonetheless [] highly persuasive . . . .").

What is remarkable about this history is the very recent vintage of prosecutorial immunity in Maryland. Maryland has maintained its own common law since 1776, but the earliest dicta suggesting that Maryland prosecutors might enjoy immunity did not arise for nearly one hundred years. MD. DECL. OF RTS. art. 5(a)(1) ("That the Inhabitants of Maryland are entitled to the Common Law of England . . . as existed on the Fourth day of July, seventeen hundred and seventy-

six . . . .”). The issue remained unsettled until 121 years after the nation's birth. William Brock, *The Idiosyncrasies of Imbler: Absolute Immunity for Prosecutors Makes Absolutely No Sense*, B.U. (Jan. 26, 2024), https://sites.bu.edu/dome/2024/01/26/the-idiosyncrasies-of-imbler-absolute-immunity-forprosecutors-makes-absolutely-no-sense/. Consequently, there can be no rational argument that prosecutorial immunity existed in Maryland when it was founded. Indeed, when the country declared its independence, Maryland adopted a state constitution, providing that:

> [T]he Inhabitants of Maryland are entitled to the Common Law of England . . . as existed on the Fourth day of July, seventeen hundred and seventy-six . . . except such as . . . may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State.

MD. DECL. OF RTS. art. 5(a)(1). But there was no prosecutorial immunity—let alone absolute immunity—under English common law. Bock, *The Idiosyncrasies of Imbler*. In fact, there were no public prosecutors in 1776 England. John H. Langbein, *The Origins of Public Prosecution at Common Law*, 17 AM. J. LEGAL HISTORY 313, 315–17 (1973). At the time, private victims prosecuted criminal cases. Bock, *The Idiosyncrasies of Imbler*. That practice persisted for over one hundred years until England established the Office of Director of Public Prosecutions in 1879. Langbein, *The Origins of Public Prosecution at Common Law*.

While Maryland courts have not been so blunt in granting prosecutors absolute immunity, the Supreme Court of the United States found that "[it is] better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Imbler*, 424 U.S. at 428 (*quoting Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)). This brutal and extreme policy choice has no doubt contributed to the fact that the United States has the highest incarceration rate of any country in the world by far—outpacing the next highest NATO country, the United Kingdom, by 470 persons per 100,000 population. Emily Widra,

28

*States of Incarceration: The Global Context 2024*, Prison Pol'y Initiative, https://www.prisonpolicy.org/global/2024.html. The following chart from the Prison Policy Initiative is cause for concern:



Source: https://www.prisonpolicy.org/global/2024.html

Moreover, an October 2021 report from The Sentencing Project found that Black Americans are incarcerated at nearly five times the rate of white Americans. Ashley Nellis, *The Color of Justice: Racial and Ethnic Disparity in State Prisons*, The Sent'g Project (Oct. 13, 2021), https://www.sentencingproject.org/reports/the-color-of-justice-racial-and-ethnic-disparity-in-stateprisons-the-sentencing-project/.

This begs the question, is it necessary to "leave unredressed the wrongs done by dishonest officers" than to subject them to the same potential liability as everyone else? *Imbler*, 424 U.S. at 428 (quoting *Gregoire*, 177 F. 2d at 581).

After all, criminal defense lawyers, including those the government procures as public defenders, receive no equivalent immunity. *Tower v. Glover*, 467 U.S. 914, 921 (1984). Those familiar with the criminal justice system are aware that public defenders and private defense

lawyers receive as much or more of their own client's ire as prosecutors. John B. Mitchell, *In (Slightly Uncomfortable) Defense of 'Triage' by Public Defenders*, 39 VAL. U. L. REV. 925, 930 (2005); John B. Mitchell, *Redefining the Sixth Amendment*, 67 S. CAL. L. REV. 1215, 1216, 1227–29 (1994). If public defenders can perform their jobs without immunity, why are prosecutors unable to do the same? More importantly, given the great power prosecutors have and the extreme trust society and the criminal justice system vest in them, why should dishonest prosecutors acting with an evil motive influenced by hate to deliberately and willfully injure be categorically immune? *Drug Fair of Md., Inc. v. Smith*, 263 Md. 341, 352 (1971).

Those who answer this question with the refrain that prosecutors do no such thing should logically have no objection to a standard permitting liability *if* prosecutors were to act in such a way. An exception of this magnitude would pose no harm to most prosecutors. Indeed, the vast majority of prosecutors are careful and honorable officers of the court who would likely have no objection to holding dishonest colleagues accountable for malicious acts.[3]

The United States Supreme Court's dramatically framed concern about the "constant dread of retaliation" is unfounded. The threat of liability for malicious acts should not place anyone acting honorably in fear. *Imbler*, 424 U.S. at 428.

The Court itself even seemed to recognize this proposition, noting that absolute immunity protects only the dishonest prosecutor. *Id*. More importantly, the civil justice system in our country is widely viewed as a vehicle to encourage good conduct by discouraging the opposite. Jill W. Lens, *Tort Law's Deterrent Effect and Procedural Due Process*, 50 TULSA L. REV. 115, 118

---

[3] While problematic prosecutors are few in number, the same is not true for their victims, so the need for reform is great.

(2014). Any prosecutor considering dishonest and malicious official conduct *should* fear the consequences of abusing their power, not be free therefrom.

But there is, after all, middle ground between allowing the rare dishonest prosecutor to run amok and striking some hypothesized fear in the heart of the many good-natured civil servants in this role. Maryland courts[4] need not adopt an easy exception. Instead, Maryland courts can and should adopt a stringent standard for denying a prosecutor immunity and exposing them to liability.

Maryland law already recognizes a spectrum of culpability from negligence to gross negligence to intent to malice. Negligence is a mere accident arising most often from lack of care or diligence for which most Marylanders can be held liable. *Barbre v. Pope*, 402 Md. 157, 164–65 (2007). Whereas "gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them."

---

[4] The immunity at issue here – being asserted by Maryland prosecutors in their role as such – arises under Maryland law.  Despite the defendants' decision to remove this case to federal court, the decision regarding modifications to this Maryland common law doctrine are properly left to Maryland Courts.  Therefore, to whatever extent this Court rules that immunity is otherwise a bar to the claims here, the plaintiff respectfully urges this Court to certify the challenge to prosecutorial immunity presented here to the Supreme Court of Maryland. Md. Code, Cts. & Jud. Proc. §§ 12-601, *et seq.* The Maryland Uniform Certification of Questions of Law Act is "designed 'to promote the widest possible use of the certification process.'" *United Bank v. Buckingham*, 449 F. Supp. 3d 521, 528 (D. Md. 2020) (quoting *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 705 (2010)). This Court should certify a question where the question "may be determinative of an issue in pending litigation," *id.* (quoting *Antonio v. SSA Sec., Inc.*, 749 F.3d 227, 234 (4th Cir. 2014)), and where "there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code, Cts. & Jud. Proc. § 12-603. Both prongs are met. *First*, if prosecutorial immunity was applied, the immunity would be determinative of issues pending in this case. *Second*, this would be an issue of first impression in the Supreme Court of Maryland. This case involves challenges to a state common law immunity under the State's constitution, and whether Article 19 would mandate a different outcome from the federal immunity. As there is no complementary provision in the United States Constitution like Article 19, there is no state or federal authority to provide any guidance to resolve this question. Accordingly, this issue is appropriate for certification.

*Barbre*, 402 Md. 157, 187 (*quoting Liscombe v. Potomac*, 303 Md. 619, 635 (1968)).  Intentional misconduct is done purposefully. *Id*. At 182. Malice, as noted above, requires intent coupled with an "evil or rancorous" motive. *Id*.

Maryland's police officers, like State's Attorneys, are public officials involved in the prosecution of criminals. MD. CODE ANN., CRIM. PROC. §§ 14-106–14-111 (West 2008) (describing the duties of Maryland state prosecutors, including investigating, and filing cases); MD. CONST. art. V, § 3; MD. CODE ANN., CRIM. PROC. § 2-102(b)(1) (West 2025). Maryland's high incarceration rate implicitly suggests that police officers have no problem performing their duties whilst remaining personally liable for misconduct spanning from gross negligence to malice. *See Maryland Profile*, PRISON POL'Y INITIATIVE, https://www.prisonpolicy.org/profiles/MD.html (last visited May 2, 2025); NELLIS & BARRY; MD. CODE ANN., CTS. & JUD. PROC. § 5-522(a)(4). Moreover, police are typically better known to the arrestee as a result of having far more personal contact, CRIM. PROC. § 2-102(b)(1), including instances of force. *Mapping Police Violence, Maryland*, POLICE DATA, https://policedata.org/report/md/statewide/uof (last visited May 2, 2025) (providing data regarding reported uses of force instances in Maryland from 2017 to 2022, which occurred more than 25,000 times). As a result, police should be far more likely to be the subject of lawsuits, yet state's police have not been so paralyzed at the thought of lawsuits for gross negligence or malice that they have been unable to do their jobs—quite the opposite has been demonstrated over the decades since the current liability scheme has been in place. *See, e.g.*, *Prince George's Cnty. Maryland v. Longtin*, 190 Md. App. 97, 141 (2010), *aff'd sub nom* 419 Md. 450 (2011); CTS. & JUD. PROC. § 5-522(b). With decades of data demonstrating that public officials can successfully arrest and participate in the prosecution of defendants whilst bearing liability for gross negligence and malice, it is high time to reconsider absolute prosecutorial immunity.

Prosecutorial immunity is, after all, purely judge-made law, meaning the courts can modify the scope of the immunity. *Gill*, 352 Md. at 770. Moreover, Maryland's Constitution provides ample support for prosecutorial liability. After all, its drafters reminded us "[t]hat all persons invested with the Legislative or Executive powers of Government are the Trustees of the Public, and, as such, accountable for their conduct . . . ." MD. DECL. OF RTS. art. 6.

Support for the abolition or modification of absolute prosecutorial immunity can be found in Article 19 of Maryland's Declaration of Rights.  Article 19 provides that:

> [E]very man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land.

*Id*. The Supreme Court of Maryland detailed the relevant history of Article 19[5] in *Piselli v. 75th Street Medical*, stating that:

> Article 19 was part of the original Maryland Declaration of Rights adopted in 1776, although it was then designated as Article 17 of the Declaration of Rights. Except for one word, the wording today is identical to the 1776 wording.  All of the original state constitutions adopted at the time of the Revolutionary War, except Virginia's and North Carolina's, contained provisions like Article 19. While the United States Constitution contains no comparable provision, today the constitutions of 39 states have clauses similar to Article 19.  These provisions, often referred to as 'Remedy Clauses' or 'Open Courts Clauses' or 'Access to Courts Clauses,' are based on

---

[5] For a more comprehensive review of the history and application of such clauses, *see Smothers v. Gresham Transfer, Inc.*, 332 Or. 83, 23 P.3d 333 (2001); Shannon M. Roesler, *The Kansas Remedy by Due Course of Law Provision: Defining a Right to a Remedy*, 47 KAN. L. REV. 655 (1999); Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 OR. L. REV. 1279 (1995); David Schuman, *The Right to a Remedy*, 65 TEMP. L. REV. 1197 (1992); David Schuman, *Oregon's Remedy Guarantee*, 65 OR. L. REV. 35 (1986); Hans A. Linde, First Things First: Rediscovering The States' Bills of Rights, 9 U. BALT. L. REV. 379, 385 (1980); RICHARD L. PERRY & JOHN C. COOPER, SOURCES OF OUR LIBERTIES 341–351 (1990); RAYMOND B STRINGHAM, MAGNA CARTA FOUNTAINHEAD OF FREEDOM 54–57 (1966); SAMUEL E. THORNE ET AL., THE GREAT CHARTER: FOUR ESSAYS ON THE MAGNA CARTA AND THE HISTORY OF OUR LIBERTY 52–61 (1965); FAITH THOMPSON, MAGNA CARTA: ITS ROLE IN THE MAKING OF THE ENGLISH CONSTITUTION, 1300-1629, at 97–99, 364–365 (1948); *see also* CARL NICHOLAS EVERSTINE, THE GENERAL ASSEMBLY OF MARYLAND, 1634-1776, at 566 (1980).

Chapter 40 of the Magna Carta or, more particularly, Lord Coke's interpretation of Chapter 40.

371 Md. 188, 204–205 (2002).

The Supreme Court of Maryland has recognized that Article 19 "generally protects two interrelated rights: (1) a right to a remedy for an injury to one's person or property; [and] (2) a right of access to the courts." *Piselli*, 371 Md. at 205. Thus, Marylanders have a general, constitutional right to redress in the courts "[w]here a person clearly has a right to money or property under a statute or common law principle, and no statute specifically provides for a remedy, Article 19 guarantees a common law remedy to enforce the right." *Id*. At 206. Moreover, "Article 19 ensures that rights belonging to Marylanders are not illegally or arbitrarily denied by the government." *Doe v. Doe*, 358 Md. 113, 127 (2000) (internal quotation marks omitted).

Accordingly, Article 19 permits only "*reasonable* restrictions upon traditional remedies or access to the courts." *Piselli*, 371 Md. at 206 (emphasis added). Article 19 also "precludes the Legislature from immunizing from suit both the government and the governmental official involved when the cause of action is based upon a violation of state constitutional rights." *Id.* at 207; *see Lee v. Cline*, 384 Md. 245, 262–64 (2004); *DiPino v. Davis*, 354 Md. 18, 50–51 (1999); *Ashton v. Brown*, 339 Md. 70, 105–06 (1995); *Ritchie v. Donnelly*, 324 Md. 344, 370–75 (1991); Clea v. City of Balt., 312 Md. 662, 680–81 (1988); *Weyler v. Gibson*, 110 Md. 636, 653–54 (1909).

Likewise, in the *Piselli* case, the Supreme Court of Maryland held that a statute of repose, running against a minor child during his or her period of minority and "barring an injured child's medical malpractice claim before the child is able to bring an action[,] is an unreasonable restriction upon the child's right to a remedy and access to the courts guaranteed by Article 19 of the Maryland Declaration of Rights." *Id*.

34

The Supreme Court of Maryland has even held that "Article 19 provides a measure of constitutional protection even for causes of action which are not based on constitutional rights." *Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 644 (2002); *see* also *Robinson v. Bunch,* 367 Md. 432, 444 (2002); *Doe*, 358 Md. at 128; *State v. Board of Education*, 346 Md. at 647; *Renko v. McLean*, 346 Md. 464, 484 (1997); *Johnson v. Maryland State Police*, 331 Md. 285, 297 (1993); *Murphy v. Edmonds*, 325 Md. 342, 365 (1992).

The court has outlined that "[w]hile Article 19 generally prohibits a grant of immunity to both the governmental official and the governmental entity which tortiously violates a plaintiff's state constitutional rights, the effect of Article 19 upon non-constitutional torts is somewhat more fluid. The test is one of reasonableness." *Lee*, 384 Md. at 264–266 (quoting *Murphy*, 325 Md. at 365). The court has specifically held that "[a] statutory restriction upon access to the courts violates Article 19 . . . if the restriction is unreasonable." *Murphy*, 325 Md. at 365. Article 19, "generally prohibits unreasonable restrictions upon traditional remedies or access to the courts but allows the legislature, pursuant to its authority to change the common law or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts." *Lee*, 384 Md. at 264– 266 (quoting *Johnson*, 331 Md. at 297).

In *Lee v. Cline*, the court ruled that "at least to the extent that the Maryland Tort Claims Act substitutes the liability of the State for the liability of the state employee committing a tort, the requirements of Article 19 are satisfied." *Id*. However, the Court carefully noted that:

> There is one issue regarding the impact of Article 19 upon Maryland Tort Claims Act immunity which has not been raised in this case, which is not likely presented by the facts of the case, and upon which we intimate no opinion. The Tort Claims Act, in § 12-104(a)(2) of the State Government Article, caps the State's liability at $ 200,000, but the Act, in § 5-522(b) of the Courts and Judicial Proceedings Article, grants total immunity to state personnel for torts "for which the State or its units have waived immunity . . . even if the damages exceed the [monetary] limits of that waiver." Whether Article 19 of the Declaration of Rights precludes the grant of

35

immunity to state personnel, to the extent that damages exceed $ 200,000, is an issue which has not previously been decided by the Court. As indicated above, we express no opinion on the issue.

*Id.*

The following principles stand out from the Court's various explanations of Article 19: any restriction on access to the Courts must be reasonable and Article 19 prohibits immunizing both the government and the individual government employee, leaving a victim without remedies. *Id.* Furthermore, Article 19 prohibits precisely what Maryland's absolute prosecutorial immunity accomplishes in practice: denying any remedy to the wronged by immunizing *both* the prosecutor and the government. *See, e.g.,* Parker v. State, 337 Md. 271, 274–75 (1995) (discussing an analogous doctrine: judicial immunity). The Supreme Court of Maryland has not only recognized that judicial immunity bars a suit and "cannot form the basis of a recovery against the State . . . .," *id.* at 286, but also that "absolute [judicial] immunity is needed to forestall endless collateral attacks on judgments through civil actions against the judges themselves." *Id.* at 287.

For all of the reasons above, absolute prosecutorial immunity violates Article 19 of the Maryland Declaration of Rights. It is unconstitutional for the courts, decades after the founding, to have declared the victims of rogue prosecutors remediless because Article 19 guarantees a remedy and reasonable access to the courts.

Absolute prosecutorial immunity also violates the right to trial by jury. Thomas Jefferson described the right to trial by jury as "'the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution.'" *Lucky Ned Pepper's, Ltd. v. Columbia Park & Recreation Asso.*, 64 Md. App. 222, 225 (1985) (quoting Thomas Jefferson, *Letter to Thomas Paine* (1789)). The fundamental right to trial by jury is enshrined in the Declaration of Rights, which provides in Article 5: "The inhabitants of Maryland are entitled to the common law of

36

England, and the trial by jury, according to the course of that law." MD. DECL. OF RTS. art. 5. Article 23 of the Declaration of Rights likewise provides "[t]he right of trial by Jury of all issues of fact in civil proceedings in the several Courts of Law in this State, where the amount in controversy exceeds the sum of $ 10,000, shall be inviolably preserved." MD. DECL. OF RTS. art. 23. Similarly, all Marylanders enjoy a right to access to the courts under Article 19, which states:

> "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

MD. DECL. OF RTS. art. 19.

Those constitutional provisions combine to create a fundamental right to trial by jury in civil matters meeting jurisdictional limits, as it was preserved under the common law of England, which cannot be abrogated by the court. As demonstrated above, there was no prosecutorial immunity in English common law; consequently, the right to sue one wrongly prosecuting the plaintiff for a crime existed. MD. DECL. OF RTS. art. 5, 23, 19. As such, access to the courts and the right to a trial by jury as to such claims is guaranteed by our constitution. *Id*.

Finally, Maryland's courts should not have adopted absolute prosecutorial immunity but should have instead trusted the matter to the legislature. Article 8 of the Declaration of Rights mandates a distinct separation of powers between the three branches of state government, providing: "[t]hat the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other." MD. DECL. OF RTS. art. 8.

After all, it is the legislature's function to create the law, and the courts are trusted with its interpretation and application. *Stearman v. State Farm Mut. Auto. Ins. Co.*, 381 Md. 436, 454 (2004) (interpreting the Maryland Constitution). But here, the courts overstepped by creating an

immunity, and an absolute one at that, which was not previously recognized in Maryland or imported via our Constitution from English common law. Bock*, The Idiosyncrasies of Imbler*; Langbein*, The Origins of Public Prosecution at Common Law*.

It is only through adoption of any prosecutorial immunity by the legislative branch that Maryland may observe the constitutional mandate of separation of powers and secure "the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government." MD. DECL. OF RTS. art. 7; *see also* MD. DECL. OF RTS. art. 8. The public's right to be heard and to otherwise participate in the legislative process is denied when critical legislative functions like the grant of immunity are performed by the courts with only the parties to a particular case before them.

Maryland's General Assembly is the traditional body to pass legislation regarding any immunities due public officials like prosecutors. Examples abound, but include the Local Government Tort Claims Act and the Maryland Tort Claims Act ("MTCA"). MD. CODE ANN., STATE GOV'T § 12-104-105 (West 2024). The MTCA grants state employees immunity for all but grossly negligent or malicious conduct and substitutes the State as the liable party for conduct not rising to these standards. *Id.*; *see Cooper v. Rodriguez*, 443 Md. 680, 706–07 (2015); *see also* MD. CODE ANN., CTS. & JUD. PROC. § 5-522(b) (West 2025). Section 5-522(b) of the Courts and Judicial Proceedings Article provides that:

> State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver.

Prosecutors fall within the statute's definition of state personnel, so their acts within the scope of their public duties, and without malice or gross negligence, are shielded from liability by statute.

This is important for two reasons. First, it demonstrates that the legislature has set ground rules for prosecutorial liability and that the judicial grant of absolute immunity should give way under the doctrine of separation of powers adopted under Maryland's Constitution. MD. DECL. OF RTS. art. 8. Second, the statutory scheme already in place permits the Court to abolish absolute prosecutorial immunity without fear of any gap in protection for prosecutors who avoid gross negligence and malice. The solutions proposed here are easy to implement and the court may act with confidence that all but what the Supreme Court called "dishonest officers" will be protected.

John Adams hoped we would form "a government of laws, not of men," but absolute immunity robs us of recourse to the law, ceding significant portions of our government to the absolute whim of the immune. AMANDA A. MATHEWS, "A GOVERNMENT OF LAWS AND NOT OF MEN": JOHN ADAMS, ATTORNEY, AND THE MASSACHUSETTS CONSTITUTION OF 1780, at 110 (Boston College 2008); *see also* MASS. CONST. pt. 1, art. XXX ("[T]o the end it may be a government of laws and not of men."). It is long past time to reconsider this extreme approach in favor of a compromise permitting prosecutorial liability in instances of gross negligence or malice. This is the only way to make good on the constitutional promise that all Marylanders "for any injury done" shall have a "remedy" and "justice and right, freely without sale, fully without any denial." MD. DECL. OF RTS. art. 19 & art. 5.

III.    **The Individual Defendants Are Not Shielded <br> from Liability Under Statutory Immunity.**

Lastly, the defense contends that the individual Defendants are statutorily immune from tort claims arising from conduct committed within the scope of their duties and without malice or gross negligence under Md. Code, Cts. & Jud. Proc. § 5-522(b) and Md. Code, State Gov't § 12-

105.[6] But even though the defense recognizes in a footnote that this statutory immunity simply transfers liability for such misconduct to the State, the defense does not fully acknowledge the interplay between the statutory immunities they cite and the Maryland Tort Claims Act, Md. Code, State Gov't §§ 12-101, et seq. ("**MTCA**"). ECF 5-1 at 11 (recognizing that "where the action was taken without malice or gross negligence, the State may be liable under the Tort Claims Act.").[7]

The MTCA, at its core, is a liability-shifting provision that provides a limited waiver to immunity to adopt vicarious liability for the negligent conduct of its officers while maintaining that such officers are individually liable for grossly negligent or malicious misconduct. This waiver is subject to § 12-105, cited by the defense, which states that "State personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article." In turn, Section 5-522(a) of the Courts and Judicial Proceedings Article provides, with irrelevant portions omitted, that:

> (a)    Immunity of the State is not waived under § 12-104 of the State Government Article for…[a]ny tortious act or omission of State personnel that:
>
>    (i)  Is not within the scope of the public duties of the State personnel; or
>
>    (ii) Is made with malice or gross negligence;

*Id*. Section 5-522 goes on, in subsection b, to provide that in the event of a finding of malice or gross negligence, the individual employee is liable.

---

[6] In this section, the defense solely seeks the dismissal of claims against the individual Defendants and do not raise any additional grounds for the dismissal of claims pled against Defendant State. ECF 5-1 at 14 ("The insufficiency of the allegations of malice and gross negligence mandates that the *individual defendant*s are entitled to statutory immunity…") (emphasis added).

[7] Indeed, the MTCA explicitly acknowledges that the State may be held liable for the tortious misconduct of a prosecutor, defining "State personnel" to include "a State's Attorney of a county or Baltimore City, or an employee of an office of a State's Attorney," Md. Code, State Gov't § 12-101(a)(8).

Therefore, "a party can bring a viable tort action against the State when the tort was committed by a State employee acting within the scope of his or her employment and without malice or gross negligence." *Cooper v. Rodriguez*, 443 Md. 680, 708 (2015) (quoting *Ford v. Baltimore City Sheriff's Off.*, 149 Md. App. 107, 120 (2002)). Essentially, "the State has accepted vicarious liability arising from the tortious conduct of State personnel." *Ford*, 149 Md. App. at 120. In this context, "malice" and "gross negligence" are not elements of the individual causes of action but rather separate findings to determine where liability should be apportioned.

In *Lee v. Cline*, 384 Md. 245, 248–66, 863 A.2d 297, 299–310 (2004), the court made it abundantly clear that the State had waived its liability for both constitutional claims and intentional torts absent malice or gross negligence:

> Section 12–104(a)(1) of the State Government Article now provides that "the immunity of the State and of its units is waived as to a tort action, in a court of the State …" **Neither intentional torts (in the absence of malice), nor torts based upon constitutional violations, are excluded….The current language of the Maryland Tort Claims Act plainly appears to cover intentional torts and constitutional torts as long as they were committed within the scope of state employment and without malice or gross negligence. There are no exceptions in the statute for intentional torts…**
>
> …
>
> …with regard to torts encompassed by the Maryland Tort Claims Act, the statute generally waives sovereign or governmental immunity and substitutes the liability of the State for the liability of the state employee committing the tort.

*Id*. (emphasis added). These standards cannot, and should not, be conflated, as individuals can certainly act intentionally without being grossly negligent or be deliberately indifferent without malice. [8]

---

[8] Similarly, intentional conduct does not automatically mean that an employee's conduct was not "within the scope of the public duties." For example, the Supreme Court of Maryland has found that police officers were acting within the scope of their duties despite committing "egregious" misconduct after planting a handgun on an individual and arresting him without cause. *See Baltimore City Police Dep't v. Potts*, 468 Md. 265, 272 (2020).

In other words, the liability-shifting provisions of the MTCA, paired with the statutory immunity relied upon by the defense, operates to shift liability between the State and the individual depending on factual findings separate and distinct from the elements of the causes of action. A single cause of action, such as a constitutional violation, could be pled against either the State or the individual, and liability could only be apportioned once a jury resolved the factual questions of whether the misconduct was within or outside the scope of the employee's duties and whether the misconduct involved grossly negligent or malicious conduct. Because there are multiple factual issues that must be resolved before liability can be apportioned, it is premature at this stage to dismiss portions of claims or parties on this basis. *See Newell v. Runnels*, 407 Md. 578, 589 (2009) (explaining that it is "for the trier of fact" to determine whether a defendant acted with gross negligence or malice for the purposes of the MTCA). As the Complaint pleads negligence, gross negligence, intent or malice in the alternative, all parties must remain in this case until these disputes are resolved. Md. Rule 2-303(c) ("A party may set forth two or more statements of a claim or defense alternatively or hypothetically.").

In addition to being simply *permitted*, alternative pleading is the appropriate and necessary approach under relevant case law. Questions of motive and intent are reserved for a jury to determine and must be pled alternatively to preserve the issue for the jury. This is especially vital given that the determination of motive and intent is highly fact specific. *Romanesk v. Rose*, 248 Md. 420, 424 (1968) ("gross negligence, is a question for the jury to decide."); *Brooks v. Jenkins*, 220 Md. App. 444, 463 (2014) ("it is 'for the trier of fact' to determine whether a defendant acted with gross negligence"); *Town of Port Deposit v. Petetit*, 113 Md. App. 401, 418 (1997) (dismissing appeal based on denial of immunity on summary judgment because immunity hinged on the existence of malice, and "[t]he issue of malice [is] one for the jury to decide."); *see also*

*Shoemaker v. Smith*, 353 Md. 143 (1999) (same); *Keesling v. State*, 288 Md. 579, 591 (1980) ("It is a question for the jury to decide whether this conduct of the police fell so far below the duty of police to protect the welfare of the public as to amount to negligence."); *Gross v. Sussex Inc.*, 332 Md. 247, 256 (1993) ("Ordinarily, summary judgment is inappropriate when intent and motive are critical to the proof of a case."); *Beall v. Holloway-Johnson*, 446 Md. 48, 67 (2016) (quotation omitted) ("[I]t is well-established that intent is a subjective element usually left for the jury's determination."); *Hicks v. Gilbert*, 135 Md. App. 394, 400 (2000) (quotation omitted) ("[S]ummary judgment generally is inappropriate when matters—such as knowledge, intent or motive—that ordinarily are reserved for resolution by the fact-finder are essential elements of the plaintiff's case or the defense.").

In summary, individual employees are not statutorily immune where a plaintiff has sufficiently alleged gross negligence or malice, as the resolution of these issues at trial will determine whether the State or the individual is liable. *Barbre v. Pope*, 402 Md. 157, 181–82 (2007) ("state personnel are not immune from suit and liability in tort when the plaintiff's complaint *sufficiently* alleges malice or gross negligence."). As Mr. Ennals has sufficiently alleged both gross negligence and malice here, this Court should decline to shield the individual Defendants at this juncture.

> To state a claim for gross negligence, a plaintiff:
>
> must allege that the defendant "intentional[ly] fail[ed] to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another" or "thoughtless[ly] disregard [ed] the consequences [of its breach of duty] without the exertion of any effort to avoid them."

*Brooks v. Jenkins*, 220 Md. App. 444, 104 A.3d 899, 908 (2014) (*quoting Barbre v. Pope*, 402 Md. 157, 935 A.2d 699, 717 (2007) (emphasis removed)). Gross negligence "has been equated with 'wilful and wanton misconduct,' a 'wanton or reckless disregard for human life or for the rights of

others.' " *Foor v. Juvenile Services Admin.,* 78 Md. App. 151, 170, 552 A.2d 947 (*quoting White v. King,* 244 Md. 348, 223 A.2d 763 (1966)). "Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case. It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached." *Romanesk v. Rose* 248 Md. 420, 423, 237 A.2d 12 (1968). The question of whether conduct constitutes gross negligence or ordinary negligence is a question that is typically reserved for the jury and is not ripe for dismissal on a motion to dismiss:

> Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case. It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached.

*Rodriguez v. State*, 218 Md. App. 573, 598–99 (2014), aff'd but criticized sub nom. *Cooper v. Rodriguez*, 443 Md. 680 (2015) (quoting *Romanesk v. Rose*, 248 Md. 420, 423 (1968)).

In *Newell v. Runnels*, 407 Md. 578, 638, 967 A.2d 729, 764-65 (2009), State's Attorney Newell terminated the employment of certain staff in his new office. Two of the discharged employees brought suit against Newell, alleging that their firings were unconstitutional because they were based on the employees having campaigned on behalf of Newell's opponent in the recent election. *Newell*, 407 Md. at 590-591. The trial court dismissed the case against Newell, finding insufficient allegations of gross negligence to permit individual liability under the MTCA. But the *Newell* Court disagreed, holding that:

> ….in the present case, a trier of fact reasonably could infer that Newell's decision to terminate Plaintiffs reflected a conscious disregard for their rights as employees. Evidence indicates that Newell was agitated by Plaintiffs' campaigning. Moreover, he gave no firm reason for firing them, if it is true that he intended to retain employees without "work ethic issues" and, as he explained to Plaintiffs, he did not have a problem with their performances.

*Newell*, 407 Md. at 639.

44

Likewise, in *Catterton v. Coale*, the court held that the fabrication of a report by a social worker can rise to the level of gross negligence. *Catterton v. Coale*, 84 Md. App. 337, 344 (1990) ("Again, the allegation of a fabrication by Coale is sufficient to show malice or gross negligence. She is, therefore, not entitled to the immunity provided in the Maryland Tort Claims Act.").

Clearly, if fabricating paperwork can be grossly negligent, or merely terminating an employee, then intentionally failing to transmit crucial exculpatory evidence and taking steps to actively cover up such misconduct must also be grossly negligent and/or malicious.

The defense contends that Mr. Ennals has not sufficiently stated gross negligence "because Mr. Ennals was held in custody prior to trial," and if that was found to be grossly negligent, then "any prosecutor would be grossly negligent any time a defendant was held in custody prior to trial and received a favorable outcome." ECF 5-1 at 13. This is obviously not Mr. Ennals' position and is a significant mischaracterization of Mr. Ennals' complaint. Mr. Ennals' unjust detention is the *damages* portion of his claims—not the *liability* portion. Rather, it states plainly in Mr. Ennals' complaint that the misconduct giving rise to liability involves prosecutorial misconduct such as:

> 133.    When the Defendants prosecuted Plaintiff after discovering exculpatory information, improperly withheld evidence from Plaintiff and Plaintiff's counsel, engaged in *ex parte* communication with the court to obtain improper delays in violation of Plaintiff's speedy trial rights, and engaged in other misconduct that deprived Plaintiff of his liberty, the Defendants had no constitutional or legally valid basis for doing so.

ECF 3 at para. 133. The grossly negligent conduct is not that Mr. Ennals was *held in custody*, as the defense claims, but that the Defendants *improperly withheld exculpatory evidence* that they *failed to timely transmit* to Mr. Ennals' counsel that demonstrated they had no probable cause to pursue claims against him. If Defendants were to comply with their discovery obligations and appropriately transmit discoverable material after they deem such material to be discoverable—as

45

in this case—they need not fear being found "grossly negligent any time a defendant was held in custody prior to trial and received a favorable outcome."

The same is true for malice. The defense correctly states that the standard for malice is "characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraudulent." ECF 5-1 at 12 (quoting *Barbre v. Pope*, 402 Md. 157, 182 (2007)). But having established the standard, the defense fails to analyze further other than to vaguely claim that there is "no allegation of a nefarious motive, no allegation of ill-will towards the plaintiff, and no allegation of a history of malice between Mr. Ennals and any of the prosecutors." *Id.*

*Lee v. Cline* provides a helpful guide. There, the Court concluded that malice had been sufficiently pled where a traffic stop "took far longer than warranted," and during that time the individual was "clearly under arrest." *Lee v. Cline*, 384 Md. 245, 270 (2004). The officer requested a canine search after the individual declined to consent to a search of his vehicle, even though "there was utterly no evidence in the record justifying such a 'search' of the vehicle." Id. The officer labeled the individual as a "suspect" despite having no reason "to label him as such." Accordingly, the Court concluded that a "jury might reasonably infer that the only factors which motivated Cline's calling Lee an uncooperative 'suspect' were that Lee was an African-American male driving a luxury car who refused to consent to a search." *Id.*[9]

This case is similar to *Lee*, and jury could easily infer wrongful motive or ill-will from the facts in the complaint. Before the Defendants even learned of Mr. Ennals, the Defendants were provided with a full confession from Mr. Johnson—the man who murdered Mr. Woolford. The

---

[9] Further, a jury could find that the Defendants failed to transmit the evidence, despite knowing that it was discoverable, because they knew that the evidence destroyed any probable cause to continue prosecuting Mr. Ennals. The "malice" prong of a malicious prosecution claim can be inferred by a lack of probable cause. *Okwa v. Harper*, 360 Md. 161, 188 (2000).

only "evidence" the Defendants ever had to substantiate their allegations against Mr. Ennals was the word of a murderer, provided to them after Officer Hallman promised to speak with the prosecutors on his case and ensure he received a deal. ECF 3 at para. 16. Mr. Ennals' name was then provided to Defendants not because he was involved in the crime—but because Mr. Johnson named multiple individuals in an attempt to save himself from the consequences of his own conduct. It is plainly evident that this is what Mr. Johnson did, given that some of the named individuals were not even in Maryland on the night of the shooting. *Id*.

Some months after proceeding to prosecute Mr. Ennals based on the word of a self-interested murderer alone, the Defendants interviewed Mr. Cottman and learned that Mr. Johnson had lied to them—that Mr. Ennals had not been involved in the murder, and had, by Mr. Johnson's own words, "bitched out" before the murder occurred. ECF 3 at para. 49. Mr. Cottman's statements were corroborated by handwritten notes Mr. Cottman had taken contemporaneously with the conversations he had with Mr. Johnson. ECF 3 at para. 32.

Defendants knew that this evidence was discoverable under *Brady* and *Giglio* and that they were obligated to disclose the material to Mr. Ennals' counsel. After all, the Defendants made several attempts to cover up their wrongdoing, including altering the date of the report to try to make it seem like the interview had occurred later than it had, ECF 3 at paras. 59-61, and failing to file discovery certificates to hide the violations from the trial court. ECF 3 at para. 57. In the alternative, the obligation to disclose the material was so obvious that Defendants constructively knew that the materials were required to be disclosed. Yet despite this knowledge, Defendants failed to transmit the materials for months and attempted to cover up their failures.

Just as the traffic stop in *Lee* took longer than normal and included a canine "search" that was unwarranted, giving rise to an inference of malice, in this case the Defendants failed to

47

transmit discovery materials for no justifiable reason and actively made attempts to cover up exculpatory information and their failure to produce it. A reasonable jury could absolutely infer that the Defendants did so out of ill-will or due to a wrongful motive. These allegations are sufficiently pled within the complaint, including, but not limited to, the following:

123.    The Defendants falsely prosecuted Plaintiff after discovering exculpatory information, improperly withheld evidence from Plaintiff and Plaintiff's counsel, engaged in *ex parte* communication with the court to obtain improper delays in violation of Plaintiff's speedy trial rights, and engaged in other misconduct that deprived Plaintiff of his liberty.

124.    There was no probable cause or justification for the prosecution of Plaintiff, as explained above; exculpatory evidence existed to prove Plaintiff's innocence, which was ignored by the Defendants, covered up by the Defendants, and/or negligently disregarded by the Defendants. Defendants also improperly withheld this evidence from Plaintiff's counsel.

125.    Further, Defendants falsified and/or misstated vital information in their court filings, in communication with Plaintiff's counsel, and in reports, including, but not limited to, the reports relating to the exculpatory interview of Mr. Cottman.

126.    The Defendants pursued prosecution against Plaintiff for incredibly serious felonious carrying extensive sentences, which resulted in the deprivation of Plaintiff's liberty for over 20 months during the pre-trial proceedings. The Defendants' extreme deprivation of Plaintiff's liberty without cause or justification demonstrates ill will, improper motivation, and/or evil motive.

ECF 3 at paras. 123-126. Accordingly, this Court should deny Defendants' motion.

## CONCLUSION

For all the reasons stated above, this Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

HANSEL LAW, PC


_____/s/ Cary J. Hansel_____

Cary J. Hansel (Bar No. 14722)
cary@hansellaw.com
2514 North Charles Street
Baltimore, MD 21218
T: 301-461-1040
F: 443-451-8606

*Counsel for Plaintiff Key'Marion Ennals*


GREENBERG LAW OFFICE

/s/ Lawrence S. Greenberg, Esq._____
LAWRENCE S. GREENBERG, ESQ.
Bar No. 23642
6 E. Biddle Street
Baltimore, MD 21202
P: 410-539-5250
F: 410-625-7891
larry@greenberglawyers.com

*Counsel for Plaintiff Key'Marion Ennals*


## CONDITIONAL REQUEST FOR HEARING

To whatever extent this Court is not inclined to deny the relief on the papers, Plaintiff requests a hearing.


## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of March, 2026, I caused the foregoing to be filed via the Court's electronic filing system, which will make service on all parties entitled to service.

_____/s/ Cary J. Hansel_____
Cary J. Hansel

49